IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYLENA ROGERS,<br><br>                Plaintiff,<br><br>   vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant.<br>_____/ | Case No. 09-CV-01972-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING THE ENTRY OF JUDGMENT FOR DEFENDANT COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF RAYLENA ROGERS |

Raylena Tranell Rogers ("Plaintiff") asserts she is entitled to Supplemental Security Income ("SSI") benefits. Plaintiff argues the administrative law judge ("ALJ") failed to include Plaintiff's social deficits in the determination of her residual functional capacity and in a hypothetical question posed to the vocational expert, and that the ALJ improperly rejected the physicians' opinions. Therefore, Plaintiff seeks judicial review of the administrative decision denying her claim for SSI benefits. For the reasons set forth below, the Court affirms.

## **PROCEDURAL HISTORY**[1]

Plaintiff filed an application for SSI benefits on February 28, 2006, alleging disability beginning January 1, 2005. AR at 20. The Social Security Administration denied Plaintiff's claim

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

on November 14, 2006, and upon reconsideration denied the claim again on July 5, 2007. *Id.* at 98-101, 105-09. Plaintiff requested a hearing on August 30, 2007, which was scheduled for October 14, 2008. *Id.* at 110, 115. However, Plaintiff failed to appear at the hearing, and it was rescheduled for January 13, 2009, at which time Plaintiff testified before the ALJ. *Id.* at 29, 134.

The ALJ determined Plaintiff was not disabled since February 28, 2006 (the application date), and issued an order denying benefits on May 8, 2009. AR at 20-28. Plaintiff requested a review of the ALJ's decision by the Appeals Council, which was denied on September 17, 2009. *Id.* at 1-4. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938). The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for SSI benefits under Title XVI of the Social Security Act, Plaintiff must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

>his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). By showing an inability to perform past relevant work, a claimant establishes a prima facie case of disability. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984). If this is shown, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Id.*

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1994). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

A.  Relevant Medical Evidence[2]

Plaintiff was treated by the Los Angeles County Department of Mental Health from 2004 to 2005. *See* AR at 228-44. On August 13, 2004, Plaintiff had an initial assessment, during which she reported multiple suicide attempts, physical and sexual abuse as a child, paranoia, and auditory hallucinations. *Id.* at 239. In addition, Plaintiff stated she used cocaine for 20 years and PCP for five years, with the last use being in April 2004. *Id.* at 241. Plaintiff was diagnosed with a

---

[2] For the purposes of this opinion, the terms "physician" and "doctor" include psychologists and other mental health professionals. The rule regarding rejecting the opinions of treating physicians applies equally to treating psychologists and medical doctors. *McAllister v. Sullivan*, 888 F.2d 599, 602 n.3 (9th Cir. 1989); *see also* 20 C.F.R § 404.1513(a)(3).

3

depressive disorder, not otherwise specified, and given a global assessment functioning ("GAF") score of 34.[3] *Id.* at 244. In September 2004, Dr. Panguluri talked to a case manager, "who reported that the work at [the] kitchen is stressful;" as a result, Dr. Panguluri recommended Plaintiff be given lighter work until stabilized on her medication. *Id.* at 281. On March 9, 2005, upon discharge, Plaintiff was given a GAF score of 40, and the doctor opined that her prognosis was "fair." *Id.* at 228.

On February 27, 2006, Leo Lucas, a certified marriage and family therapist from the Fresno County Department of Behavioral Health, performed a "comprehensive assessment" on Plaintiff. *Id.* at 253-59. Plaintiff was suspicious, but cooperative and engaging to the examiner. *Id.* at 255. During the examination, Plaintiff exhibited poor immediate recall, short-term memory, and long-term memory. *Id.* at 256. Plaintiff was given a GAF score of 45 and diagnosed with a major depressive disorder, post-traumatic stress disorder, and polysubstance dependence.[4] *Id.* at 257.

Plaintiff received treatment also at Turning Point of Central California ("Turning Point"). *See* AR at 323-572. On April 18, 2006, Dr. Parayno performed a psychiatric assessment on Plaintiff, and noted Plaintiff had been clean and sober for two years. *Id.* at 401. Plaintiff appeared angry and depressed during the examination. *Id.* at 402. Her memory, insight, judgment, and thought content were within normal limits. *Id.* Dr. Parayno diagnosed a major depressive disorder and post-traumatic stress disorder with agoraphobia. *Id.* at 403. Further, Dr. Parayno gave Plaintiff a GAF score of 50.

As part of her treatment at Turning Point, Plaintiff was asked to rate herself on a scale of 1 to 10, with a "1" being terrible and "10" being great. *See, e.g.,* AR at 353. The primary service coordinator ("PSC") would also rate Plaintiff, with "1" signifying unstable "10" indicating stable.

---

[3] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score in the range of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." *DSM-IV* at 34.

[4] A GAF score in the range of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job." *DSM-IV* at 34.

4

*Id.* For example, on June 15, 2006, Plaintiff rated herself as a "5," as did the PSC, who noted Plaintiff was "increasing her communication . . . [and] becoming more social with peers." *Id.* at 547-48. On July 28, 2006, Plaintiff commented that "she loves who she is today" and rated herself as "7," as did the PSC. *Id.* at 353. In one of the final "progress notes" on October 24, 2006, Plaintiff rated herself as a "7" again, and the PSC rated her as "8," observing Plaintiff "has made positive progress." *Id.* at 426-27.

Dr. Ekram Michiel conducted a comprehensive psychiatric evaluation on October 14, 2006. AR at 268-71. Plaintiff reported a history of childhood molestation, hearing voices, depression, incarceration, and drug use. *Id.* at 268-69. Dr. Michiel observed, "She is relaxed, cooperative, and friendly with frequent, appropriate smiling during the interview. She even is joking." *Id.* at 269. Dr. Michiel opined Plaintiffs "behavior during the interview does not confirm her claim of hearing voices all the time and other hallucinations." *Id.* Dr. Michiel diagnosed Plaintiff with an unspecified adjustment disorder, and gave her a GAF score of 65.[5] *Id.* at 270. Dr. Michiel offered the following functional assessment: "She currently is capable of maintaining attention and concentration to carry out simple, repetitive tasks, but not extensive varieties of technical or complex job instructions. She is capable of relating appropriately to coworkers, supervisors, and the public." *Id.* Further, Dr. Michiel opined Plaintiff's adjustment symptoms would not interfere with regular attendance in the workplace or doing simple, repetitive tasks, but her symptoms "might impair her ability to deal with the usual stress encountered in a competitive workplace and performing detailed, complex tasks." *Id.* at 270-71.

On November 14, 2006, Dr. A.H. Middleton reviewed Plaintiff's medical record and found Plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions. *Id.* at 272. In addition, Plaintiff was "moderately limited" in her ability to respond appropriately to changes in the work setting. *Id.* at 273. In all other categories on the mental residual functional capacity check-list form regarding concentration, persistence, social interaction,

---

[5] A GAF score in the range of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

5

and adaptation, Plaintiff was "not significantly limited." *Id.* at 272-73. However, in a separate rating of functional limitations, Dr. Middleton opined Plaintiff was moderately limited in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. *Id.* at 283. Dr. Middleton noted Plaintiff was "[a]ble to follow simple directions;" "interact appropriately with coworkers, [supervisors] and the public;" and "adapt to simple changes in the work environment." *Id.* at 273. Dr. Middleton concluded Plaintiff could perform simple work. *Id.* at 285.

Dr. Ronald Portnoff examined Plaintiff and reviewed the medical record on July 25, 2007. AR at 576-92. Plaintiff had tenderness on the left side of her body, including her neck and shoulder, as well as "left paraspinal tenderness anteriorly and posteriorly" and left periscapular tenderness. *Id.* at 582. Also, Plaintiff showed "tenderness in the paravertebral areas and the sacroiliac joints." *Id.* at 586. Testing revealed low back pain was produced by flexion, extension, rotation, compression, and straight-leg-raising. *Id.* In addition, Plaintiff "lacked 12 inches from touching fingers to the floor." *Id.* Plaintiff had normal muscle strength, and normal range of motion in her hips, knees, and ankles. *Id.* at 587-88. Plaintiff had decreased range of motion in her cervical spine and lumbar spine. *Id.* at 591. Specifically, the lumbar spine examination showed Plaintiff's "[f]orward flexion was 50º/90º, extension 20º/30º, side-bending 20º/30º, [and] rotation 10º/30º." *Id.* at 586. Plaintiff was unable to squat, or walk on her toes or heels. *Id.* at 588. In detailing work limitations, Dr. Portnoff opined, "The examinee cannot sit or stand more than 30-60 minutes. She cannot lift and carry more than 15 pounds." *Id.* at 591. Dr. Portnoff noted, "Improvement is anticipated with medical care." *Id.*

On September 24, 2008, Dr. Portnoff reexamined Plaintiff. AR at 642-55. Dr. Portnoff found Plaintiff still had "left paraspinal tenderness anteriorly and posteriorly," as well as left periscapular and left shoulder tenderness. *Id.* at 645. Again, back pain was produced by flexion, extension, rotation, compression, and straight-leg-raising. *Id.* at 648. Plaintiff had normal range of motion in her hips, knees, and ankles. *Id.* In the lumbar spine examination, Plaintiff "lacked 3 inches from touching fingers to the floor. Forward flexion was 80/90º, extension 30/30º, side-bending 30/30º, [and] rotation 30/30º. *Id.* at 649. Plaintiff was able to walk on her toes and heels, and to perform a squat. *Id.* at 650. Dr. Portnoff opined Plaintiff was able to "perform all activities

of daily living." *Id.* at 652.  With regard to work limitations, Plaintiff "should avoid repeated bending, stooping, and heavy lifting." *Id.*

     B.   Hearing Testimony[6]

Plaintiff stated she had problems taking care of her personal needs, and was unable to take care of her finances. *Id.* at 35, 43. Plaintiff reported she did not do household chores, cook, shop, or provide childcare for her grandchildren while her daughter worked. *Id.* at 35-36.  Plaintiff said she did not attend a regular social activity such as church. *Id.* at 36.  Rather than leave the townhouse shared with her daughter and three grandchildren, Plaintiff stated on a typical day she would watch television and lie down because "my anxiety has me where I don't go out much and that's a problem with me and my kids because they try to force to me to go places I don't want to go to, so I'm mostly in the house." *Id.*  However, when Plaintiff left the house, she said her son would drive because she was scared to do so and did not have a driver's license. *Id.* at 35.  Plaintiff said she did not use public transportation unless her son was unavailable, "but 9 out of 10" times her son was her means of transportation. *Id.*

Plaintiff discussed her history of depression while at the hearing.  Plaintiff said she was molested by her stepfather "many times" when she was seven-to-twelve years old, and believed this contributed to her depression. *Id.* at 49-50.  Plaintiff reported flashbacks and nightmares about her stepfather molesting her. *Id.* at 52.  She commented voices told her to cause harm to herself or other people. *Id.* at 50.  In addition, Plaintiff said she had anxiety attacks, cried "a lot," and slept "all the time." *Id.* at 43.  Plaintiff stated she had the anxiety attacks "when . . . around a lot of people" or if she was "excited about something." *Id.* at 52-53.  Plaintiff stated she was treated for mental health, and was taking medication (Wellbutrin) for her symptoms. *Id.* at 42-43.  Further, Plaintiff stated she had problems with losing her temper because she did not like being told what to do, for which Plaintiff stated she went to anger management. *Id.* at 50-51.  Plaintiff said she had problems with her anger when she worked, and expressed a belief that she was about to be fired before she was injured on the job because she "got into it" with her supervisor. *Id.* at 51-52.

---

[6] Plaintiff's arguments regarding the ALJ's findings deal primarily with her mental abilities and limitations. Therefore, testimony regarding Plaintiff's physical abilities is omitted.

7

Vocational expert ("VE") Judith L. Najarian testified after Plaintiff at the hearing; the ALJ posed hypothetical questions to the VE, after which Plaintiff's counsel posed questions. First, the ALJ asked the VE to consider an individual with the same education and work background as Plaintiff. AR at 55. In addition, the ALJ asked the VE to assume the person: "could lift and carry 20 pounds occasionally, 10 pounds frequently, sit, stand or walk 6 hours, could occasionally crouch, crawl, climb, stoop, kneel, and also occasionally reach overhead with the left upper extremity, which is the nondominant hand." *Id.* Further, the individual was "restricted to simple, routine tasks." *Id.* The VE responded there were light, unskilled jobs the individual could do, such as fruit cutter, poultry boner or cutter, and cafeteria attendant. *Id.* at 55-56.

Second, the VE was asked to assume the same characteristics of the individual described in the first hypothetical, but to "add a sit/stand option." AR at 56. The VE responded that none of the jobs from the first hypothetical would be available. *Id.* The VE requested information from Plaintiff concerning her ability to count change, and she stated she "could count like one dollars, the 5s, 10s, 20s, like that." *Id.* at 57. Therefore, the VE opined there would not be jobs available "at the light level" but there could be at the sedentary level if seating was available. *Id.* at 57-58.

Next, the ALJ asked the VE to consider an individual who could "lift and carry 15 pounds occasionally, 10 pounds frequently, sit 6, stand or walk 2, with the occasional crouch, crawl, climb, stoop, kneel" and was limited to "simple, routine tasks." AR at 58. In addition, the ALJ asked the VE to assume that the individual would have limited overhead reaching with the left hand. *Id.* at 59. According to the VE, unskilled, sedentary work would be available to such an individual, including positions as an assembler, sorter, or cuff folder. *Id.* at 58-59. If this person had "no sustained neck," then the VE concluded there would not be any jobs available. *Id.* at 59-60.

Plaintiff's counsel asked the VE whether a person "with adjustment symptoms that might impair her ability to deal with the unusual stress encountered in a competitive workplace and performing detailed, complex tasks" would be able to perform the jobs mentioned. AR at 60. The VE opined work would be eliminated "if a person occasionally cannot deal with . . . the usual stress of a workplace." *Id.* at 61. Although jobs would be eliminated if a person could not lift items due to numbness in a hand (*Id.* at 62), the VE reported that a person who could perform "simple, repetitive

tasks" but had "a moderately limited ability to respond to changes in a work setting" would be able to perform the jobs previously identified because they were not "the types of jobs that have changes." AR at 61. Finally, Plaintiff's counsel requested the VE to consider an individual who possessed "a moderate degree of limitation for . . . activities of daily living, maintaining social functioning and maintaining concentration." *Id.* at 62. The VE opined, "That would eliminate the jobs at the moderate limitation level." *Id.*

### C.  The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff has not engaged in substantial gainful activity since the application date of February 28, 2006. AR at 22. Second, the ALJ found Plaintiff has the following severe impairments: a major depressive disorder, depression, panic with agoraphobia, cervical degenerative disc disease and strain, left shoulder degenerative joint disease, bilateral knee degenerative joint disease, and lumbar spondylosis and strain. *Id.* These impairments, "considered singly and in combination," did not meet or medically equal a listing. *Id.* Though Plaintiff had a history of polysubstance abuse, the ALJ found "it is non-severe and not material to the issue of disability" because "there is no evidence this condition causes more than minimal, if any, limitations on the claimant's ability to perform basic work activities." *Id.*

At the fourth step, to determine Plaintiff's residual functional capacity ("RFC"), the ALJ considered "the entire record." AR at 23; *see also* AR at 23-26. The ALJ determined Plaintiff had the RFC "to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk 6 hours in an 8-hour work day, occasionally crouch, crawl, climb, stoop, kneel, and reach overhead with her upper left extremity, and perform simple routine tasks." *Id.* at 23. The ALJ determined that Plaintiff did not have past relevant work to which she could return. *Id.* at 24. However, the ALJ concluded Plaintiff was capable of performing jobs existing in significant numbers in the national economy, such fruit cutter, poultry boner, and cafeteria attendant. *Id.* at 27.

## DISCUSSION AND ANALYSIS

Prior to determining Plaintiff's RFC, the ALJ found Plaintiff had "mild restriction of activities of daily living, moderate difficulties in maintaining social functioning; mild difficulties in

1  maintaining concentration, persistence or pace; and no episodes of decompensation." AR at 23.

2  Evaluating the medical evidence, the ALJ stated,

> Greater weight is given to the opinion of Dr. Portnoff as to the claimant's physical limitations; no other doctor has given a residual functional capacity. As for the claimant's mental condition, greater weight is given to the opinion of the state agency doctors. The opinion of Dr. Michel (sic) is given less weight . . .

*Id.* at 26. In addition, the ALJ considered the testimony of the vocational expert in her determination that Plaintiff could perform unskilled, light work at in the national economy. *Id.* at 27-28.

    A.  <u>The ALJ did not err in evaluating the medical opinions.</u>

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians, (2) examining physicians, who examine but do not treat the claimant, and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d. 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Thus, the courts apply a hierarchy of deference to medical opinions based upon the nature of services provided by the physician. Here, Plaintiff argues the ALJ failed to give valid reasons for rejecting the opinions of examining physicians Dr. Portnoff and Dr. Michiel, and the consultative physician Dr. Middleton. (Doc. 17 at 9-13).

A physician's opinion is not binding upon the ALJ when the ALJ provides clear and convincing reasons for rejecting an opinion. *Coats v. Heckler*, 733 F.3d 1338, 1340 (9th Cir. 1984). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Moreover, an "ALJ

is entitled to choose between differing medical opinions of equal weight. Indeed, that is the ALJ's function." *Williams v. Astrue*, 2010 U.S. Dist. LEXIS 93511, at *16 (N.D. Cal. Sept. 8, 2010) (where the opinions of two examining physician opinions were in direct conflict), citing *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995).

*Opinion of Dr. Portnoff*

Plaintiff argues that "the ALJ committed reversible error when she failed to give valid reasons for rejecting the opinions of Dr. Portnoff." (Doc. 17 at 9). Plaintiff contends Dr. Portnoff "addressed her work limitations, noting she 'cannot sit or stand more than 30-60 minutes. She cannot lift and carry more than 15 pounds.'" *Id.*, quoting AR at 591. Plaintiff argues that, though the ALJ stated greater weight was given to the opinion of Dr. Portnoff, these limitations were not incorporated into her RFC finding, and no reasons were given for rejecting the limitations. *Id.*

Plaintiff does not correctly set forth Dr. Portnoff's opinion. Although in July 2007, Dr. Portnoff gave the opinion Plaintiff cites, he noted that he expected Plaintiff to improve with medical care. AR at 591. In fact, Dr. Portnoff found improvements in her condition when he examined Plaintiff in September 2008. At the time, Dr. Portnoff observed that Plaintiff had a greater ability to reach toward the floor (distance decreased from 12 inches to 3 inches) and larger range of motion (forward flexion increased from 50/90º to 80/90º; extension increased from 20/30º to 30/30º; side bending increased from 20/30º to 30/30º; and rotation increased from 10/30º to 30/30º). *Id.* at 586-88; 648-50. Furthermore, Plaintiff was able to walk on her heels and toes, and perform a squat, which she was unable to do in the previous examination. *Id.* Given these improvements, Dr. Portnoff offered new work limitations, finding Plaintiff "should avoid repeated bending, stooping, and heavy lifting." *Id.* at 652. Thus, the 2007 opinion that Plaintiff argues the ALJ failed to properly "reject" was, in fact, rejected by Dr. Portnoff in 2008, when he outlined different work limitations for Plaintiff.

The ALJ noted "the overall objective findings were improved from the prior examination," and that Dr. Portnoff offered new work limitations. AR at 24. The ALJ is not obligated to give weight to an opinion that the physician rejected himself with a new opinion at a later date. Rather, greater weight should be given to the more recent opinion of a physician. *See Lester*, 81 F.3d at 833

(the more recent opinion of a treating physician is entitled to more weight than an earlier opinion); *see also Champion v. Barnhart*, 36 F. App'x. 921, 922 (9th Cir. 2002) (the ALJ's "selective reliance" on a treating physician's earlier opinion was not supported by the record).  Thus, the ALJ gave Dr. Portnoff's 2008 opinion great weight in a proper manner, because the opinion rejected previous work limitations and was based on a more complete evaluation after Plaintiff received treatment.

*Opinion of Dr. Michiel*

The ALJ gave "little weight" to Dr. Michiel's opinion that Plaintiff "may not be able to deal with the usual stress encountered in the workplace." AR at 25; *see id.* at 270-71.  The ALJ stated this opinion was "equivocal and not supported by the medical evidence of record which shows that the claimant's mental condition actually improved." *Id.* at 25.

Plaintiff contends the ALJ "inaccurately characterized the record" when the ALJ stated Plaintiff's position as house manager "necessarily involves the ability to deal with stress;" Plaintiff's "symptoms appeared to be well-controlled when she was complaint with her treatment and medications and not abusing drugs or alcohol;" and that "nothing . . . indicate[s] the claimant cannot handle usual workplace stress." (Doc. 17 at 10, quoting AR at 25).  In response, Plaintiff stated:

> Plaintiff's testimony indicates she cannot handle usual workplace stress. One of her LA County Mental Health doctors, Dr. Panguluri, noted that "work at the kitchen is stressful work," and she recommended that Plaintiff "have lighter work to alleviate her anxiety till she is stabilized on her medication.  Dr. Michiel's opinions are also evidence to indicate the claimant cannot handle usual stress. Moreover . . . just two weeks after it was noted that Plaintiff had been appointed house manager—which is not equivalent to work activity—Plaintiff's caseworker reported, "Consumer has had an increase in irritability to 1-2x a week due to being the House manager and dealing with issues in the room and board involving other residents . . .

(Doc. 17 at 10) (internal citations omitted).  Plaintiff asserts the ALJ took evidence of Plaintiff's temporary improvement out of context, and such action is not permitted under the Ninth Circuit as stated in *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008).  As a final point, Plaintiff argues that the ALJ improperly asserted her lay opinion for Dr. Michiel's professional opinion. (Doc. 19 at 8).

The ALJ was prohibited from substituting her own interpretation of medical evidence for the opinion of a medical professional. *See Tackett v. Apfel*, 180 F.3d 1094, 1102-03; *Banks v. Barnhart*,

434 F.Supp.2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"). Here, however, the ALJ did not simply substitute her opinion for that of the examining physician. Rather, the ALJ found this portion of Dr. Michiel's opinion was unsupported by the evidence, though still adopting Dr. Michiel's opinion that Plaintiff could perform simple, repetitive tasks.

The testimony of Plaintiff that she could not handle usual workplace stress was rejected by the ALJ, who found Plaintiff lacked credibility regarding the "intensity, persistence, limiting effects of [her] symptoms." *See* AR at 26. Notably, Plaintiff did not challenge the ALJ's credibility determination. The ALJ found Plaintiff's credibility was diminished by inconsistent statements, "her criminal record, history of substance abuse, lack of treatment for her physical complaints, voluntary cessation of treatment for her mental symptoms, as well as periodic non-compliance with her mental health treatment and medications." *Id.* at 27. These are proper considerations for a credibility finding by the ALJ. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (in assessing credibility, an ALJ may consider "prior inconsistent statements concerning the symptoms, . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and . . . the claimant's daily activities"). Thus, the ALJ properly rejected Plaintiff's testimony, and it does not support the assertion that she is unable to handle workplace stress.

Plaintiff ignores other evidence given at the time her caseworker reported an increase in Plaintiff's irritability because of her position as house manager on September 15, 2006. The same day, the case worker noted Plaintiff "has decreased . . . helplessness and hopelessness to 0x a week. Consumer has not experienced isolation or withdrawal at this time, [and] she maintains her daily activities." AR at 467. On September 19, 2006, Plaintiff rated herself as a "9" out of 10, indicating she felt great, and the PSC assessed her at a "10" on the stability scale. *Id.* at 460. Also, Plaintiff reported she had "less feelings of depression or stress." *Id.* at 461. Moreover, on October 13, 2006 (only one day before Dr. Michiel examined Plaintiff), she "report[ed] feelings of happiness and hope," and rated herself at as an "8" while the PSC noted "consumer is making progress." *Id.* at

434-35. This indicates Plaintiff's conditions had improved, as does the fact that her GAF score increased from 34 to 65 at the time of Dr. Michiel's examination. *See id.* at 244, 270.

Though Dr. Michiel hypothesized Plaintiff "may not be able to deal with the usual stress encountered in the workplace," the ALJ rejected this for not being supported by the record. This is a specific, legitimate reason for giving Dr. Michiel's opinion less weight than the other examining physician. *See, e.g., Matney*, 981 F.2d at 1019 ("an ALJ may discredit treating physician's opinions that are . . . unsupported by the record as a whole"). Plaintiff attempted to offer evidence supporting Dr. Michiel's opinion that Plaintiff could not deal with workplace stress, but the ALJ properly considered—and rejected—this evidence. *Id.* ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Therefore, the ALJ properly gave "less weight" to the opinion of Dr. Michiel regarding Plaintiff's ability to handle stress in the workplace.

*Opinion of Dr. Middleton*

Plaintiff argues the ALJ failed to comply with Social Security Ruling 96-6p, which states, "Administrative law judges and the Appeals Council may not ignore [the] opinions [of non examining sources] and must explain the weight given to these opinions in their decisions." (Doc. 17 at 13, quoting SSR 96-6p). The ALJ found Plaintiff had moderate difficulties in maintaining social functioning, and mild restrictions or difficulties in activities of daily living and maintaining concentration, persistence, or pace. AR at 23. Plaintiff argues that this is reversible error, because the ALJ "gave no reasons for rejecting Dr. Middleton's contrary opinions that Plaintiff . . . has moderate restriction of activities of daily living, and moderate difficulties in maintaining concentration, persistence or pace." (Doc. 17 at 3).

As a non-examining physician, Dr. Middleton's opinion is afforded the least weight. *Lester*, 81 F.3d at 830. Generally, "[t]he weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1201 (9th Cir. 2008, quoting 20 C.F.R. § 404.1537(d)(3). Notably, the relevant portion of Dr. Middleton's opinion is presented in check-list form without explanation for the findings. *See* AR at 272-285. A physician's opinion that is "conclusory and brief" and lacks

1  support of clinical findings may be rejected by an ALJ.  Magallanes v. Bowen, 881 F.2d 747, 751
2  (9th Cir. 1989) Likewise, an ALJ may discredit a physician's opinion that is in the form of a
3  checklist where the opinion lacks supportive objective evidence.  See Crane v. Shalala (76 F.3d 251,
4  253 (9th Cir. 1996) ("The ALJ permissibly rejected…check-off reports that did not contain any
5  explanation of the bases of their conclusion"); Batson v. Comm'r of the Soc. Sec. Admin., 359 F.3d
6  1190, 1195 (9th Cir. 2004) (physician's "views carried only minimal evidentiary weight" where in
7  the form of a checklist and lacking supportive objective evidence).

8      With regard to activities of daily living, the ALJ discussed the counselors' notes at Turning
9  Point, which stated that Plaintiff "was able to utilize public transportation and maintain independent
10 living and daily activities by going outside and spending time with her grandchildren."  AR at 24.
11 The counselors noted that after Plaintiff's appointment as house manager, she "continued to maintain
12 her daily activities."  *Id.* at 25.  In addition to the notes of the counselors, the ALJ considered
13 Plaintiff's "own description of the activities she is able to perform."  *Id.* at 27.  Furthermore, the ALJ
14 noted Dr. Portnoff's opinion that Plaintiff "could perform all activities of daily living, but should
15 avoid repeated bending, stooping, and heavy lifting."  As an examining physician, Dr. Portnoff's
16 opinion is entitled to more weight than the opinion of Dr. Middleton, a non-examining physician.
17 *See* 20 C.F.R. § 404.1527(d)(2).  By considering Plaintiff's own testimony and the opinion of Dr.
18 Portnoff, formed after examination of Plaintiff nearly two years after Dr. Middleton's review of the
19 medical records, the ALJ properly rejected Dr. Middleton's opinion that Plaintiff had moderate
20 restriction in activities of daily living.

21     The opinion that Plaintiff had "moderate difficulties in maintaining concentration, persistence
22 or pace" was not shared by Dr. Michiel.  As noted by the ALJ, Dr. Michiel opined that Plaintiff
23 "could maintain attention and concentration to carry out simple repetitive tasks."  AR at 25; *see also*
24 AR at 270.  Because this opinion was given by an examining physician, it was entitled to greater
25 weight.  In addition, Dr. Middleton did not explain the bases for his opinion that Plaintiff had
26 moderate difficulties.  *See id.*, at 283.  However, these difficulties were included in the ALJ's RFC
27 when she imposed the restriction of simple, routine tasks.  In *Sabin v. Astrue*, "the ALJ determined
28 the end result of [the plaintiff's] *moderate* difficulties as to concentration, persistence, or pace was

that she could do simple and repetitive tasks." *Sabin v. Astrue*, 337 F.App'x. 617, 621 (9th Cir. 2009) (emphasis added) *see also Stanley v. Astrue*, 2010 U.S. Dist. LEXIS 130755, at *16 (E.D. Cal. Nov. 30, 2010) ("in limiting Plaintiff to simple, repetitive tasks, the ALJ properly incorporated in his RFC finding [the doctor's] opinion that Plaintiff had *moderate* difficulties in maintaining concentration, persistence, or pace") (emphasis added).  Therefore, Plaintiff's difficulties with concentration, persistence or pace were incorporated in the RFC, whether described as *mild* (as the ALJ found) or *moderate* (as Dr. Middleton opined).

Incorporation of the Plaintiff's difficulties with concentration, persistence, or pace into the RFC was consistent with Dr. Middleton's opinion that Plaintiff could perform simple tasks, an opinion to which the ALJ gave "greater weight." AR at 26; *see also id.* at 285.  Thus, for this reason as well, the ALJ did not err; the assessment was supported by substantial evidence.  The RFC was consistent with restrictions identified by both Dr. Middleton and Dr. Michel limiting Plaintiff to simple, repetitive tasks. *See Stubbs-Danielson v. Astrue*, 359 F.3d 1169, 1174 (9th Cir. 2008) ("an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence or pace where the assessment is consistent with restrictions identified in the medical testimony").

B.  <u>Restraining Plaintiff to simple, repetitive tasks adequately addressed Plaintiff's limitations in social functioning.</u>

Plaintiff argues that the ALJ "failed to assess Plaintiff's mental residual functional capacity." (Doc. 17 at 7).  According to Plaintiff, "Finding a claimant has the residual functional capacity to perform simple routine tasks does not address the claimant's mental residual functional capacity or capture the ALJ's own finding that Plaintiff has <u>moderate</u> difficulties in maintaining social functioning." *Id.* (emphasis in original).  Further, Plaintiff argues, "There is nothing magical about 'simple, routine work' that exempts a worker performing such work from having to maintain social interactions with co-workers, supervisors, or the public."  (Doc. 19 at 3).  However, in so arguing, Plaintiff fails to acknowledge that, after limiting Plaintiff to simple routine tasks, the ALJ's ultimate determination was Plaintiff could perform work at the "unskilled light occupational base."  AR at 27.

As discussed above, deficiencies in a claimant's mental residual functional capacity may be captured by an ALJ limiting the claimant to simple, repetitive tasks. *See, e.g., Sabin*, 337 F. App'x.

at 621. Moreover, the ALJ's limitation to simple, repetitive work lead to the conclusion that Plaintiff could perform unskilled work. By definition,

> Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation are needed.

20 C.F.R. § 416.968(a). The basic mental demands of unskilled work include the abilities "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 SSR LEXIS 20. The occupational base of unskilled work is eroded only when a claimant has a "substantial loss of ability to meet any of these basic work-related activities." *Id.*

Here, the ALJ determined Plaintiff could perform unskilled light work, and named example jobs of fruit cutter, poultry boner, and cafeteria attendant. In the position of fruit cutter, a worker "cuts dried, fresh, candied, or crystallized fruit into cubes or pieces for candy filings and for garnishing iced candies, using [a] knife." *DOT* 521.687-066.[7] The amount of interaction between workers in this position and other people is "not significant." *Id.* Similarly, the amount of social interaction required by a poultry boner is "not significant." *DOT* 525.687-070. A cafeteria attendant: "Carries trays from food counters to tables for cafeteria patrons. Carries dirty dishes to kitchen. Wipes tables and seats with dampened cloth. Sets tables with clean linens, sugar bowls, and condiments. May wrap clean silver in napkins." *DOT* 311.677-010. The *DOT* notes that the interaction with people is "not significant." *Id.* Thus, each of the positions do not require workers to maintain social interactions with others; to the contrary, the interaction with other individuals is "not significant."

Because the ALJ found no substantial loss of Plaintiff's basic work-related abilities, she did not err in limiting Plaintiff to simple, repetitive tasks in the RFC or concluding from this RFC that

---

[7] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

17

1  Plaintiff could perform unskilled work.  Notably, this Court previously held that "unskilled work
2  accommodates a need for limited contact with the general public." *Gutierrez v. Astrue*, 2010 U.S.
3  Dist. LEXIS 26337, at *16 (E.D. Cal. Feb. 27, 2010); *see also Langford v. Astrue*, 2008 U.S. Dist.
4  LEXIS 39294, at *22 (E.D. Cal. May 14, 2008) ("unskilled work . . . accommodated [the claimant's]
5  need for 'limited contact with others'"); *Martinez v. Astrue*, 2009 U.S. Dist. LEXIS 75651, at *11
6  (C.D. Cal. Aug. 25, 2009) ("'unskilled' work assumes jobs that involve little interaction with
7  others"); SSR 85-15, 1985 SSR LEXIS 20 (unskilled jobs "ordinarily involve primarily dealing with
8  objects, rather than with data *or people*) (emphasis added).  Consequently, the ALJ accounted for
9  deficiencies in Plaintiff's mental residual functional capacity with the limitation to simple, routine
10 tasks.

11       Despite this, the Court finds that even if the ALJ should have more specifically addressed
12 Plaintiff's moderate limitation in maintaining social functioning, the ALJ's failure to do so was
13 harmless given that the limitation to simple, repetitive tasks led to the conclusion that Plaintiff could
14 perform unskilled work.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (harmless
15 error exists when it is clear that the ALJ's error was inconsequential to the ultimate non-disability
16 determination) (citations and quotations omitted); *see also Batson v. Comm'r of the Soc. Sec.
17 Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding error harmless where it did not negate the
18 validity of the ALJ's ultimate conclusion).

19       C.   <u>The ALJ properly used the vocational expert's testimony to determine Plaintiff could
20            perform work in the national economy.</u>

21       There are two ways for the Commissioner to establish there is work in "significant numbers"
22 in the national economy a claimant can perform:  testimony of a VE or the Medical-Vocational
23 Guidelines.  *See Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  An ALJ may call a VE
24 "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do;
25 and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101
26 (9th Cir. 1999), 62 Soc. Sec. Rep. Service 607.  Here, because Plaintiff did not have the capacity to
27 perform the full range of light work under the Medical-Vocational Guidelines, the ALJ sought
28 testimony from the VE "[t]o determine the extent to which [Plaintiff's] limitations erode the

unskilled light occupational base." AR at 27.  This is consistent with Social Security Ruling ("SSR") 83-12, which requires an adjudicator to consult a vocational resource when "the extent of erosion of the occupational base is not clear." *Id.*

The ALJ may pose "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration" when eliciting testimony. *Tackett*, 180 F.3d at 1101, quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987).  The description of impairments "must be accurate, detailed, and supported by the medical record." *Id.*  Only limitations supported by substantial evidence must be included in the question. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock*, 240 F.3d at 1163-65.  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  When the "weight of the medical evidence supports the hypothetical questions posed by the ALJ," the ALJ's findings will be upheld by the court. *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

Plaintiff argues that "the ALJ's vocational hypothetical did not accurately reflect Plaintiff's actual limitations" because it "failed to include limitations the ALJ, herself, found Plaintiff to have." (Doc. 17 at 14).  Specifically, Plaintiff argues that the ALJ found Plaintiff had moderate difficulties in maintaining social functioning, and failed to incorporate the difficulties in social functioning into the RFC or the hypothetical question. *Id.*  However, as discussed above, the ALJ restricted Plaintiff to simple, routine tasks in her RFC, a decision that was supported by the medical evidence.  Further, the ALJ asked the VE to assume "an individual with the same education and work background as Plaintiff" had limited physical abilities, and was "restricted to simple, routine tasks."  Consequently, Plaintiff's assertion that the testimony of the VE has no evidentiary value is without merit, because the question posed incorporated the mental limitations as determined by the ALJ.

## **CONCLUSION**

The ALJ noted the original work limitations offered by Dr. Portnoff in 2007, but relied properly upon Dr. Portnoff's 2008 opinion that rejected his earlier opinion.  Also, the ALJ properly afforded less weight to the opinion of Dr. Michiel, which was not supported by the medical

evidence. Finally, the ALJ gave the proper weight to the opinion of non-examining physician Dr. Middleton.

Limiting Plaintiff to simple, routine tasks captured Plaintiff's deficiencies in daily living and moderate difficulties with concentration, persistence, or pace. Further, the ALJ's ultimate conclusion that Plaintiff could perform unskilled, light work addressed Plaintiff's limitations in social functioning, because unskilled work accommodates a need for limited interaction with other individuals. With the occupations named by the ALJ, the interaction with people was "not significant." Therefore, because the residual functional capacity was supported by the evidence, the hypothetical question posed to the vocational expert regarding Plaintiff's limitations was proper.

For all these reasons, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court because the ALJ applied the proper standards and her findings are supported by substantial evidence. *See Sanchez*, 812 F.2d at 510. Moreover, as stated above, any error made by the ALJ was harmless and was inconsequential to the ultimate determination that Plaintiff was not disabled. *See Tommasetti*, 533 F.3d at 1038.

Accordingly, the Court **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Commissioner of Social Security and against Plaintiff Raylena Tranell Rogers.

IT IS SO ORDERED.

Dated:  **January 25, 2011**                    /s/ Jennifer L. Thurston
                                                                    UNITED STATES MAGISTRATE JUDGE